KOSKI v VOHS

Docket No. 69982. Submitted April 16, 1984, at Detroit.—Decided
September 17, 1984. Leave to appeal applied for.

Aldred Koski brought an action for malicious prosecution in
Oakland Circuit Court. Named as defendants were: Kenneth
Vohs, a Madison Heights police officer and the president of the
Madison Heights Police Officers Association; Joseph D. White-
field, Madison Heights assistant police chief and later police
chief; the Oakland County prosecutor, L. Brooks Patterson;
Danny R. Daniel, an investigator employed by the Oakland
County prosecutor's office; and three other members of the
Madison Heights Police Officers Association.

At the jury trial before Robert C. Anderson, J., it was
established that Koski had contracted with the Madison
Heights Police Officers Association to publish a public relations
magazine. The contract provided that any advertising revenues
which were raised were to be deposited in the association's
bank account to be held in trust to cover publication expenses
with any remaining revenues to be divided between the pub-

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error §§ 885, 886.
　　52 Am Jur 2d, Malicious Prosecution §§ 192, 193.
[2] 52 Am Jur 2d, Malicious Prosecution §§ 1, 6 et seq., 46, 51.
　　Necessity and sufficiency of allegations in complaint for malicious
　　prosecution or tort action analogous thereto cause. 14 ALR4th
　　264.
[3] 52 Am Jur 2d, Malicious Prosecution § 5.
[4] 52 Am Jur 2d, Malicious Prosecution §§ 81, 83.
　　Reliance on advice of prosecuting attorney as defense to malicious
　　prosecution action. 10 ALR2d 1215.
[5] 52 Am Jur 2d, Malicious Prosecution § 45 et seq.
[6, 7] 52 Am Jur 2d, Malicious Prosecution §§ 66-69.
　　63A Am Jur 2d, Prosecuting Attorneys §§ 1, 4.
　　Civil liability of judicial officer for malicious prosecution or abuse of
　　process. 64 ALR3d 1251.
[8] 52 Am Jur 2d, Malicious Prosecution § 50 et seq.
[9, 11, 12] 52 Am Jur 2d, Malicious Prosecution § 128 et seq.
[10] 52 Am Jur 2d, Malicious Prosecution § 184.
[11, 12] 52 Am Jur 2d, Malicious Prosecution § 178.

lisher and the association in accordance with the provisions of the contract. Personnel of the magazine solicited advertising from local merchants. Funds collected by the magazine personnel were to be deposited with the association. Delay in the publication of the magazine and a difference of opinion as to how much money was in the magazine account led to a falling-out between Koski and the association, which in turn led to the suspension of further expense payments by the association to Koski. When the magazine was printed in July, 1971, the printing bill was more than expected. Vohs, as president of the association, notified Koski that there were insufficient funds in the account to cover the printing costs. Koski insisted that there should be sufficient funds and that Vohs should check with the association's treasurer, Officer Dennis Carley.

While both the association and Koski were contemplating civil actions, one of the advertisers brought to the attention of Vohs the fact that their $100 check had been negotiated by Koski over his endorsement of the check which had been made payable to the association. Vohs turned in an incident report to Police Chief Whitefield which characterized the nature of the incident as forgery and listed the association as the victim. In September, 1977, Whitefield, together with the city manager and members of the association, asked the Oakland County Prosecutor to investigate the incident. The matter was assigned to Danny R. Daniel, an investigator for the prosecutor's office, for investigation. During his investigation, Daniel determined that several other checks had been negotiated by Koski. Daniel was apprised of the fact that there was an underlying civil dispute and that both the association and Koski contemplated civil actions. Koski informed Daniel that he had negotiated the checks because they belonged to him and that Carley had said that he could "have a hundred". Koski further informed Daniel of his displeasure at having the prosecutor's office act as a collection agency for the association.

Even though Daniel did not seek an independent audit of the association's and the publisher's books, he proceeded to take his information to the chief of warrants and persuaded that assistant prosecutor to authorize a warrant for Koski's arrest. The warrant contained three counts: one count for larceny by conversion of an item exceeding $100 in value and two counts for larceny by conversion of amounts not exceeding $100, each count involving a separate check. A preliminary examination was commenced on December 19, 1977, at which Officer Carley testified. The examination was adjourned and eventually the complaint was dismissed for lack of prosecution when Officer

Carley failed to appear to testify at the later hearing. The chief assistant prosecutor authorized a new warrant on the charges, the warrant was reissued, and a new preliminary examination date was scheduled. Before the preliminary examination was held on the reissued warrant, Officer Carley admitted taking money from the association's treasury. Whitefield notified the prosecutor's office of this turn of events. The prosecution against Koski, nevertheless, continued. Following the preliminary examination, the examining magistrate dismissed the charges against Koski on the basis that the prosecutor's office did not have enough evidence to prove the requisite criminal intent.

Following the presenting of these proofs, plus proof of damages, Koski rested. The defendants then remaining, Vohs, Whitefield, Patterson and Daniel, each moved for a directed verdict. Anderson granted the motions for a directed verdict, holding that Koski had failed to meet his burden of proof with respect to want of probable cause, a necessary element of an action for malicious prosecution. Koski appeals. *Held:*

1. The trial court properly granted directed verdicts in favor of defendants Vohs and Whitefield, since the prosecution of Koski was commenced not on the basis of the information supplied by Vohs and Whitefield but rather on the basis of the information secured in the investigation by the prosecutor's office. Even if the information supplied by Vohs and Whitefield was less than a full and fair disclosure of the facts known by them, it cannot be said that the prosecution was instituted by them.

2. The trial court properly granted a directed verdict in favor of defendant Patterson, since his involvement was within the scope of his duty as a county prosecutor and a prosecutor is immune from liability for malicious prosecution with respect to acts undertaken within the scope of his quasi-judicial function as a county prosecutor.

3. Since the dismissal on the merits at the preliminary examination of the criminal prosecution against Koski is sufficient evidence to carry Koski's burden of proof as to want of probable cause relative to defendant Daniel, there existed a jury question as to the question of want of probable cause. Accordingly, it was error for the trial court to grant a directed verdict in favor of defendant Daniel.

Affirmed in part, reversed in part.

W. J. CAPRATHE, J., dissented in part. He would hold that the dismissal on the merits at the preliminary examination does not provide evidence in support of Koski's burden of proof with

respect to want of probable cause and, accordingly, since the facts were undisputed, the question of want of probable cause was properly decided by the trial court in the context of the motion for directed verdict. He would affirm as to all defendants.

### Opinion of the Court

1. APPEAL — DIRECTED VERDICTS.

The standard of appellate review of a directed verdict in favor of a defendant in a malicious prosecution action is whether, taking the evidence in a light favorable to the plaintiff, a prima facie case of liability is established.

2. MALICIOUS PROSECUTION — TORTS.

The elements of malicious prosecution are: (1) a criminal proceeding instituted or continued by the defendant against the plaintiff, (2) termination of the proceeding in favor of the accused, (3) absence of probable cause for the proceeding, and (4) "malice" or a primary purpose other than that of bringing the offender to justice.

3. MALICIOUS PROSECUTION — ACTIONS.

Malicious prosecution actions are not favored or encouraged except in plain, compelling cases.

4. MALICIOUS PROSECUTION — PROSECUTING ATTORNEYS — FULL DISCLOSURE.

The advice and concurrence of a public prosecutor is not a good defense to an action for malicious prosecution unless it appears that the defendant fully and fairly disclosed to such officer everything within his knowledge tending to cause or exclude belief in plaintiff's guilt; whether such disclosure was made is a question for the jury to determine and not for the trial or appellate court; however, one is not subject to liability for malicious prosecution, even where one has made less than a full and fair disclosure, where the prosecutor has made a full investigation of the complaint and has decided to seek prosecution on the basis of his own investigation.

5. MALICIOUS PROSECUTION — MALICE — PRIVATE CLAIMS.

The commencement of a criminal prosecution for the purpose of collecting a private claim is very strong, if not conclusive, evidence of malice, since commencement of a criminal action for such a purpose is an abuse of the process of the courts and cannot be justified.

6. MALICIOUS PROSECUTION — IMMUNITY — JUDGES — PROSECUTING
   ATTORNEYS.

   Immunity from suits for malicious prosecution has long been
   granted to the judiciary and this immunity has gradually been
   extended to prosecuting attorneys, on the theory that they act
   in a quasi-judicial capacity.

7. PROSECUTING ATTORNEYS — MALICIOUS PROSECUTION — INVESTIGA-
   TION OF CRIMES — IMMUNITY.

   The duties and powers of a prosecuting attorney include the
   power to conduct investigations to determine whether criminal
   proceedings should be instituted; accordingly, a prosecuting
   attorney is immune from liability for malicious prosecution for
   acts resulting from an investigation undertaken by his office.

8. MALICIOUS PROSECUTION — PROBABLE CAUSE.

   Probable cause for the purpose of a defense in an action for
   malicious prosecution exists where there was a reasonable
   ground of suspicion which was supported by circumstances
   which were sufficiently strong in themselves to warrant an
   ordinarily cautious man to believe that the person arrested was
   guilty of the offense charged; whether or not probable cause
   exists is to be measured by the facts as they existed as of the
   time the prosecution is commenced.

9. MALICIOUS PROSECUTION — PROBABLE CAUSE — BURDEN OF PROOF.

   A plaintiff in an action for malicious prosecution has the burden
   of proof to establish that the defendant lacked probable cause
   to have instigated the criminal proceedings against the plain-
   tiff.

10. MALICIOUS PROSECUTION — PROBABLE CAUSE — QUESTION OF LAW.

    The existence or want of probable cause on the part of a defen-
    dant in an action for malicious prosecution is a question of law
    where there is no dispute as to the facts available to the
    defendant when he signed a criminal complaint.

11. MALICIOUS PROSECUTION — PROBABLE CAUSE — BURDEN OF PROOF
    — PRELIMINARY EXAMINATIONS.

    The discharge on the merits of an accused by an examining
    magistrate following a preliminary examination on the crimi-
    nal charge, while sufficient evidence of want of probable cause
    to meet the accused's burden of proof as to that element in a
    subsequent action against the complainant for malicious prose-
    cution, is not conclusive evidence of the want of probable cause
    for the complaint.

PARTIAL CONCURRENCE AND PARTIAL DISSENT BY W. J. CAPRATHE, J.

12. MALICIOUS PROSECUTION — PROBABLE CAUSE — BURDEN OF PROOF — PRELIMINARY EXAMINATIONS.

The dismissal of criminal charges on the merits by an examining magistrate following a preliminary examination is not evidence of the want of probable cause such as will sustain the accused's burden of proof of want of probable cause in his subsequent action for malicious prosecution, since the question of lack of probable cause in the malicious prosecution action focuses on the presence or lack of probable cause at the time the criminal action was instigated, not on its presence or absence at the time of the preliminary examination.

Paterson & Adams (by James Paterson), for plaintiff.

Moore, Sills, Poling & Wooster, P.C. (by John L. Wooster), for Vohs and Whitefield.

Kohl, Secrest, Wardle, Lynch, Clark & Hampton (by Michael L. Updike), for Patterson and Daniel.

Before: HOOD, P.J., and BEASLEY and W. J. CAPRATHE,* JJ.

BEASLEY, J. On November 14, 1979, plaintiff, Aldred Koski, started a suit for malicious prosecution against seven defendants. Five of these were or had been Madison Heights police officers, and the others were the Oakland County Prosecutor (L. Brooks Patterson) and an investigator in his office. Eventually, in November, 1982,[1] trial commenced and, after six days of trial, when plaintiff had completed putting in his case, the trial court granted a motion for directed verdict brought on behalf of the four defendants then remaining in

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] When commenced, this case was assigned to Judge William John Beer, who was responsible for the case until January 1, 1981, when Judge Robert C. Anderson assumed responsibility.

the case, namely, Whitefield, Vohs, Daniel and Patterson. The basis for the trial court's ruling was a finding that as a matter of law defendants had probable cause to initiate criminal prosecution against plaintiff.

Plaintiff appeals as a matter of right. For the reasons to be indicated, we affirm the grant of a directed verdict with respect to defendants Kenneth Vohs, Joseph D. Whitefield and the Oakland County Prosecutor. With respect to defendant Danny R. Daniel, we reverse and remand for trial on the merits.

Plaintiff Koski worked for many years as a news reporter for various newspapers and radio stations. For three years, he worked for the Michigan State Police Troopers Association, where his duties included editing the Trooper, a monthly tabloid about the State Police. From this job, plaintiff got the idea to publish public relations magazines for local law enforcement agencies and began Monitor Publications, Ltd., in 1973.

In early 1974, plaintiff published a magazine for the Madison Heights Police Officers Association (MHPOA). Through 1975, he published magazines for 10 other suburban Detroit law enforcement agencies. On August 18, 1975, plaintiff entered into a contract to produce a second magazine for the MHPOA. This contract was signed on behalf of the MHPOA by Gerald Crossley, president, Herbert Allen, vice president, and Dennis Carley, secretary-treasurer.

To raise funds for the magazine, Monitor personnel solicited advertising from area merchants. The contract provided that the advertising revenues were to be deposited in an association bank account and held "in trust to insure publishing costs, expenses and against the profit-split". MHPOA

was obligated to make payments to Monitor to cover expenses incurred in carrying out the project. Once all expenses were paid, the MHPOA was to receive a minimum payment of $5,000, assuming sufficient revenues were generated, after which it would share in remaining profits at the rate of 30% until an additional sum of $3,000 was attained.

Collection of advertising revenues was to be handled in three ways: (1) Monitor personnel would receive cash or a check from the advertiser at the time of solicitation of the advertisement; (2) the advertiser could mail a check to the police station; or (3) the advertiser could opt to pay upon publication. The plan was that at the end of each day that revenues were received, plaintiff would go to the police station, make a log of each payment and determine how much was to be paid over to Monitor.

Plaintiff sold his first account in September, 1975. According to the terms of the contract, the magazine was to be published within 12 weeks of the first sale. However, plaintiff ran into difficulties. First, he was faced with falling advertising sales because of competition from a person representing the Fraternal Order of Police or the Metropolitan Club. Plaintiff's efforts to invoke ¶ 6 of his contract and to have the police department mediate the dispute did not result in a satisfactory result. Plaintiff tried to sell bumper stickers to raise the needed revenues. Second, plaintiff had some sort of a falling-out with Officer Carley, the association's secretary-treasurer, which resulted in further expense payments to Monitor being terminated.

Nevertheless, by December 5, 1975, plaintiff had the magazine covers prepared and had 11,500

"rolled" on a press. In January, 1976, plaintiff sent a letter to the association membership indicating the funds received up to that time. As a result, Officer Carley released "a little bit" of money for expenses, but, on February 10, 1976, Officer Carley again cut off all funds. Plaintiff did not receive any substantial payment until December, 1976, and, consequently, had to lay off his staff and was unable to complete the magazine.

On July 21, 1976, plaintiff had a meeting with Officer Thomas Linville, who had become president of the association earlier that year, and other officers in the association. Plaintiff claims that Officer Carley was away on vacation at that time, but that fact is in dispute. Lieutenant Jerry Sloan, a long-time friend of plaintiff and the brother of then Chief of Police, William Sloan, attended the meeting as plaintiff's representative.

At the meeting, publication of the magazine, an accounting and release of funds to plaintiff were discussed. Plaintiff asserted that the association account should contain at least $10,000. Officer Linville, however, indicated he did not know what funds were in the account. This would suggest that Officer Carley was not present with his books. Plaintiff claimed that the upshot of the meeting was that an accounting would be immediately forthcoming. Officer Linville, however, believed that the accounting was to follow publication. Nothing further occurred until September, 1976, when Officer Carley gave plaintiff a check and promised an accounting. Neither publication nor the accounting was performed by December, 1976, when the parties agreed that plaintiff should resume advertising sales.

In September, 1976, Officers Linville and Carley went to the Oakland County Prosecutor's office to

complain about their contract problems. After seeing Chief Assistant Prosecutor Richard Thompson, they were referred to the consumer affairs division, where it was explained to them that they had a civil, not a criminal, complaint.

In March, 1977, the association made a complaint to the Attorney General's office. A meeting was held with plaintiff and officers of the association present. Joseph Whitefield, who was then assistant chief of police, attended at the request of Chief Sloan. The matters discussed at the meeting included plaintiff's lack of a charitable trust license, failure to circulate the Monitor magazine, and plaintiff's claim that money was stolen from the association account. The meeting culminated with a deadline being set for plaintiff to publish the magazine.

Plaintiff had the magazine printed in July, 1977. In August, plaintiff received a call from defendant Officer Kenneth Vohs, who was the new association president. Officer Vohs explained that the printing bill was $3,600 more than expected and that, according to Officer Carley, the association could not pay it without running out of funds. Furthermore, Officer Vohs said that Officer Carley had told him that the association had already paid its share and any excess was for plaintiff to pay. Plaintiff responded that there should be plenty of funds and requested that Officer Vohs check with Officer Carley, who was still the secretary-treasurer. Plaintiff also stated that he was collecting the pay-on-publication accounts so that about $2,000 in additional revenues should be coming in. Plaintiff claimed that the additional billing from the printer was due to increased costs over the original estimate.

On August 29, 1977, after discussing a possible

civil action against the association with his attorney, plaintiff was intercepted in the street by Officer Vohs, and they discussed the magazine's problems. Initially, plaintiff suggested to Officer Vohs that he talk with plaintiff's attorney. Plaintiff explained to Officer Vohs that the association should handle distribution of the magazines, and he gave Officer Vohs 25 to 30 magazines to show to businessmen who called about them. Plaintiff also said that, if there really were insufficient funds in the association account, there was some reason for it other than his expenses. Officer Vohs, however, was unfamiliar with how the association's funds were handled and trusted Officer Carley in the matter.

While Officer Vohs told plaintiff that businessmen were complaining about nonproduction of the magazine, he did not tell plaintiff that on August 15, 1977, there had been a complaint about plaintiff's endorsing a check made payable to the association. Mr. Jackson, of Spalding DeDecker and Associates, a purchaser of advertising in the magazine, told Officer Vohs that on August 4, 1977, a man fitting plaintiff's description had come in, identified himself as Dennis Carley and requested a check made out to Monitor Magazine. Jackson had refused the request because he understood the check was supposed to be made out to the association, but he had later mailed a check for $100 to the police station. After getting this report from Jackson, Officer Vohs returned to the station and spoke with secretary Elsie Keil. She stated that on or about July 26, 1977, plaintiff had come to the station and asked if there was any mail. She had a check from McDonald's, but refused to hand it over. Plaintiff then made a telephone call to Lieutenant Sloan and handed the receiver to Mrs. Keil.

Sloan allegedly told her: "Give any checks that come in for the Monitor Magazine to Al Koski." She thereupon gave plaintiff the envelope from McDonald's. Mrs. Keil further said that on August 11, 1977, Dennis Archambault, one of plaintiff's employees, had come to the station and picked up two envelopes containing checks, one from Spalding DeDecker and one from Parish Publications. On August 16, 1977, Jackson called Officer Vohs to report that the cancelled Spalding DeDecker check had been returned. Officer Vohs obtained the check, which was endorsed "Madison Heights POA/Monitor 061113437 /s/ Al Koski", and wrote up an incident report, characterizing the nature of the incident as a forgery and listing the association as the victim. Vohs claimed that Officer Carley had told him that plaintiff was to be paid only from money deposited in the association account.

Officer Vohs turned in the incident report to Joseph D. Whitefield, who had become chief of police on August 15, 1977. Because of other obligations, Chief Whitefield did not look at the incident report until after Labor Day. Then, noting that the association and Lieutenant Sloan were involved, Chief Whitefield went to the city manager and suggested that an outside agency be called in to investigate the incident. The city manager agreed. Whitefield and the city manager, together with officers of the association other than Vohs, met with Oakland County Prosecutor Patterson on September 9, 1977. Chief Whitefield requested a complete investigation of the incident report, as well as of all officers involved with the Monitor Magazine. Defendant, Danny R. Daniel, a criminal investigator with the prosecutor's general investigations division and a former police officer and deputy sheriff, was given the incident report and

cancelled check and was assigned to investigate the matter.

Defendant Daniel made an investigative report which, in brief, states as follows. Daniel interviewed Mrs. Keil and Jackson, confirming what had been earlier related to Officer Vohs. On October 6, 1977, Daniel met with Officer Carley, examined the association's record books and requested a list of advertisers that appeared in Monitor Magazine, but not in the record books. On October 18, 1977, Officer Carley supplied eight names, including Oakland Dodge and Spalding DeDecker. Daniel spoke with personnel from Oakland Dodge and was told that a man fitting plaintiff's description had picked up a check for $420 made payable to the association and dated December 6, 1976. On November 7, 1977, Daniel obtained and served a search warrant for the Monitor Magazine account at Michigan National Bank. At the time of service, Daniel discovered that the Spalding DeDecker check had been cashed, but not deposited. Later the same day, Daniel spoke with Lieutenant Sloan, who explained that, when he talked with Mrs. Keil on July 26, she had not said that the mail contained a check, but had told him the envelope was addressed to Monitor Magazine. He had then told her that plaintiff was Monitor Magazine and she would have to give him the envelope. In her statement to Daniel, Mrs. Keil, however, denied that she had read the address to Sloan or that the envelope was made out to other than the association. Daniel also interviewed Rick Dowell, the bank teller who accepted the Spalding DeDecker check. Daniel claimed that Dowell had admitted that the endorsement was irregular, but had stated that he cashed the check because he thought that plaintiff was a friend of the bank manager.

In his investigation, Daniel learned about the underlying contract dispute. He knew of the prior complaint to the prosecutor's office which had been closed out as being a civil matter. He also knew that both parties contemplated civil action. He was in contact with Officer Vohs on six to eight occasions.

In early November, 1977, Daniel visited plaintiff at his home. Daniel verified that plaintiff had taken the Oakland Dodge check to the bank and stated that Chief Whitefield and the city manager had made a complaint. Daniel did not mention Officer Vohs' incident report. Plaintiff told Daniel that he had all the Monitor records and Daniel was welcome to look at them. Daniel declined. Plaintiff claims that Daniel said the records were not important and he did not want to look at them. Daniel asserts that the records were placed haphazardly in big cardboard boxes.

The day after Daniel's visit, plaintiff was called by Officer Vohs, who said that he did not want to give plaintiff trouble and, if plaintiff would pay the printer and get the magazines released, they could go their separate ways and the association would not pursue a breach of contract action. Plaintiff respondend that he had already paid more than enough. After Officer Vohs hung up, plaintiff called Daniel to complain about the prosecutor's office being used as a collection agency. In testifying at trial, Officer Vohs claimed that he had not really connected his call with any criminal proceeding.

On November 22, 1977, plaintiff went to the prosecutor's office with his attorney to give a statement to Daniel. After being given his *Miranda*[2] warnings, he was questioned at length and

[2] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

made it clear to Daniel that he believed he had done nothing wrong and was entitled to the money from the checks he had cashed. Plaintiff said to Daniel of the checks: "But they belonged to me. In other words, Carley told me I could have a hundred". Plaintiff told Daniel that the $420 Oakland Dodge check was cashed to help pay expenses for a trip to Alpena to take pictures of a police funeral at which, according to Officer Carley, police officers from the Madison Heights Police Department were to be in attendance. Plaintiff said that the check had been picked up by Don Adams, one of his employees. Plaintiff also denied to Daniel having asked for the Spalding DeDecker check. Rather, plaintiff claimed it was another employee, Dennis Carey, who had serviced that account. Plaintiff had been accompanied to the prosecutor's office by Dennis Archambault. Daniel, however, declined to question Archambault.

Apparently, Daniel was convinced in his mind that plaintiff had committed a crime, even though he had neither made independent examination of the books and records of the MHPOA and Monitor Magazine nor sought to obtain an audit. To him, the crucial fact was that he did not believe plaintiff was authorized to sign the checks. Daniel took his information to the chief of warrants and persuaded that assistant prosecutor to authorize a warrant for plaintiff's arrest. At trial, Daniel testified that he believed that he submitted information on four checks: from Oakland Dodge, McDonald's, Parish Publications and Spalding DeDecker. The warrant, however, did not apply to the McDonald's check, which had been made payable to "Monitor/MHPOA". It should be noted, though, that on November 22, 1977, Daniel told plaintiff that there was no problem with the McDonald's check.

The warrant contained three counts: one count for larceny by conversion over $100 (the Oakland Dodge check) and two counts for larceny by conversion not exceeding $100. District Court Judge Bolle issued the warrant, and plaintiff turned himself in voluntarily on November 30, 1977. He was arraigned that morning and stood mute. As he left the courtroom, he saw the court clerk hand Daniel a note. Daniel made a telephone call and then tore up the note, leaving the pieces in a cigarette-butt receptacle. Plaintiff retrieved the pieces and put together a note which read: "Dan Daniels *[sic]*, call Brooks Patterson 858-0646."

That afternoon, a lengthy article appeared in the Daily Tribune about plaintiff's arraignment and the dispute over publication of the Monitor Magazine. The article included statements attributed to Prosecutor Patterson. Plaintiff maintains that he was arraigned shortly before 10:30 a.m., which was the deadline for the Daily Tribune. Articles appeared the following day in the Free Press, Madison News and Oakland Press.

Plaintiff's preliminary examination was begun on December 19, 1977. Officer Carley and Mrs. Keil testified for the prosecution. Mr. Hensley, from Oakland Dodge, also testified, but was unable to identify plaintiff as the man who had picked up the check (although Mr. Hensley had identified plaintiff's photograph for Daniel during the investigation). The examination was adjourned to a later date, at which time Officer Carley did not appear to testify and Judge Bolle dismissed the complaint for lack of prosecution.

It was represented that Officer Carley had remained home to care for a sick son, since his wife had already left for work and he had not been able to contact the prosecuting attorney's office until

8:30 a.m. When Chief Assistant Prosecutor Thompson was notified of the dismissal and of Officer Carley's reason for not appearing, he reauthorized the warrant on the felony charge. The warrant was reissued and a new preliminary examination date set. Because of winter weather and other reasons, the examination was adjourned until April 4, 1978.

In the meantime, events were taking an unexpected turn within the association itself. The audit of the association account, requested by plaintiff and Chief Whitefield and perhaps by Daniel and others, was finally started. When Officer Ken Baughman was elected secretary-treasurer in October, 1977, he found the records that he received from Officer Carley in a state of such disarray that he felt incapable of sorting things out himself. On behalf of the association, he had certified public accountant David Mutschler hired to do the audit. Mutschler was unable to complete the audit because too many records were missing, but he did reach several conclusions, one being that Officer Carley had written himself unauthorized checks. All in all, Officer Carley had individually received almost $8,000. Carley had written checks to himself as early as September 25, 1975. As to plaintiff, while Mutschler found some inconsistencies, he could not determine from the available records either that plaintiff had done anything wrong or that plaintiff was entitled to the checks taken.

On March 16, 1978, Officer Carley talked to Officer Vohs, who had become president of the association in July, 1977, and confessed to taking money from the association. Officer Vohs told Officer Carley to go home immediately and he would contact the chief of police. A meeting was held at Chief Whitefield's house and, on March 17,

1978, Officer Carley resigned from the police force. Chief Whitefield set up a meeting with Chief Assistant Prosecutor Thompson on March 31, 1978, at which time Daniel was called in to handle the case. Carley was successfully prosecuted and, at the time of trial in the instant case, was an escapee from a halfway house.

In spite of the fact that Carley confessed to taking substantial funds from the association account, Chief Assistant Prosecutor Thompson neither sought dismissal nor halted the criminal case against plaintiff; the prosecution against plaintiff continued. On April 4, 1978, District Judge Bolle concluded the preliminary examination by dismissing the charge against plaintiff on the merits. Judge Bolle ruled that the prosecutor did not have enough evidence to prove the requisite criminal intent and, therefore, declined to bind the case over to the circuit court for trial.

Because of the criminal prosecution, plaintiff said he felt humiliated before the many news and law enforcement personnel he was familiar with. He resigned as editor of a sports magazine and had an article turned down by a newspaper because of the incident. Equipment from his business was repossessed because he could not continue payments. He said he lost contracts or potential contracts with other police departments to do magazines similar to the Monitor Magazine published for the association. For these injuries, he claimed damages.

On appeal from a directed verdict, the standard of review is whether, taking the evidence in a light favorable to plaintiff, a prima facie case of liability is established.[3] In this case, plaintiff charges defen-

---

[3] *Blanchard v Monical Machinery Co,* 84 Mich App 279; 269 NW2d 564 (1978).

dants with malicious prosecution. The elements of malicious prosecution are:

"a. a prosecution caused or continued by one person against another

"b. termination of the proceeding in favor of the person who was prosecuted

"c. absence of probable cause for initiating or continuing the proceeding

"d. initiating or continuing the proceeding with malice or a primary purpose other than that of bringing the offender to justice".[4]

Malicious prosecution actions are not favored or encouraged except in plain, compelling cases.[5]

The trial court granted the motion for directed verdict of each of the defendants on the ground that plaintiff had not met his burden of proof as to the third element of actions for malicious prosecution, stating that the "number one thing that sticks out is the probable cause. I do not see how the jury, based upon what's been presented here, could say that there was not probable cause." The trial court did not rule on the other elements of malicious prosecution. Defendants have conceded that the criminal proceedings terminated in plaintiff's favor.

On appeal, we first consider the grant of directed verdicts in favor of defendants Vohs and Whitefield. As previously indicated, the first element of malicious prosecution is causing or continuing a prosecution against another. Here, Officer Vohs made out an incident report and sent it to Chief Whitefield, who then passed it along to the

---

[4] SJI2d 117.01, added September, 1982. See *Wilson v Yono,* 65 Mich App 441, 443; 237 NW2d 494 (1975).

[5] *Renda v International Union, UAW,* 366 Mich 58, 74; 114 NW2d 343 (1962). Also see *Friedman v Dozorc,* 412 Mich 1, 32-42; 312 NW2d 585 (1981).

Oakland County Prosecutor's office to investigate. These actions, in and of themselves, do not constitute causing a prosecution. Plaintiff, however, argues that because certain material facts were concealed, defendants improperly induced the prosecutor to institute proceedings.

As stated in *Webster v Fowler:*[6]

"It is a well-established rule of law that the advice and concurrence of a public prosecutor is not a good defense to an action for malicious prosecution unless it appears that the defendant fully and fairly disclosed to such officer everything within defendant's knowledge which would tend to cause or to exclude belief in plaintiff's guilt; and whether the defendant did make a full and fair disclosure to the district attorney was a matter for the jury to determine, and not for the trial court or this Court."

While we would agree that defendant Vohs made something less than a full disclosure to the prosecutor, plaintiff's argument must fail because the prosecutor's investigator, defendant Daniel, conducted an independent investigation and decided to seek prosecution based on his own findings. In the within case, Officer Vohs and Chief Whitefield played no part in the investigation and arrest of plaintiff after the September 13, 1977, meeting with the prosecutor.[7]

With respect to defendants Vohs and Whitefield, plaintiff has not addressed in his brief the issue of probable cause. Since defendants Vohs and Whitefield did not initiate the prosecution, but submitted the matter to the prosecutor to investigate and bring charges as he saw fit, this is understandable.[8]

---

[6] 89 Mich 303, 304; 50 NW 1074 (1891).

[7] *Wilson v Yono, supra.*

[8] *Thomas v Winters,* 258 Mich 429, 432; 242 NW 780 (1932).

Plaintiff's remaining arguments regarding defendants Vohs and Whitefield are primarily directed to the final element, malice. In *Gallaway v Burr*,[9] the Supreme Court stated:

"We are all of opinion that where a criminal prosecution is commenced for the purpose of collecting a private claim, such fact would be very strong, if not conclusive evidence of malice, and that advice of counsel under such circumstances would be no protection. The commencement of a criminal action for such a purpose is an abuse of the process of the courts, and cannot be justified."

In the *Gallaway* case, after the defendants presented the known facts to an attorney and were told that plaintiff was guilty of a criminal offense, defendants themselves made the complaint. However, there is no precedent extending the rule of *Gallaway* to a situation like the present where defendants, Vohs and Whitefield, merely submitted enough facts to the prosecutor to get an independent investigation under way.[10] While there may be enough evidence to infer that defendants acted with malice to take that question to a jury, the action of defendants Vohs and Whitefield does not rise to the level of initiating the prosecution, because Daniel's independent investigation is interposed between the request of defendants Vohs and Whitefield for an investigation and the ultimate prosecution of plaintiff. Thus, for these reasons, we affirm the trial court's order granting directed verdicts in favor of defendants Vohs and Whitefield.

Next, we consider plaintiff's argument that the

---

[9] 32 Mich 332, 335 (1875).

[10] See, *e.g.*, *Hall v American Investment Co*, 241 Mich 349; 217 NW 18 (1928).

trial court erred in granting a directed verdict in favor of defendant Oakland County Prosecutor Patterson. In this regard, plaintiff has offered no proof that defendant prosecutor individually initiated the prosecution of plaintiff. On the contrary, the undisputed evidence is that defendant Patterson merely turned the matter over to his investigator, defendant Daniel, who reported his progress to Chief Assistant Prosecutor Thompson, not to defendant Patterson. While Prosecutor Patterson was advised of plaintiff's arrest and arraignment, there is no evidence that he personally kept track of, aided or encouraged the continuing investigation of plaintiff which culminated in the charges of larceny by conversion.

Although it is not very clearly articulated, apparently plaintiff argues that defendant Patterson ratified and encouraged the prosecution by his remarks to the press following plaintiff's arraignment. While on these proofs we do not accept that proposition, nevertheless, we consider the matter of probable cause in relation to defendant Patterson. Plaintiff has not directly imputed to the prosecutor any knowledge of plaintiff's claim of ownership to the checks taken; the evidence is squarely contrary. Thus, as to defendant Patterson, the fact issue of who had the rightful claim to the money represented by the checks was irrelevant. He didn't know plaintiff claimed ownership. Whether defendant prosecutor had probable cause to believe that plaintiff was guilty of larceny by conversion was a question for the lower court to decide as a matter of law, because, as to him, plaintiff established no issue of material fact. Presumably, defendant prosecutor got his information from his investigator's report, which indicated that plaintiff had endorsed and cashed checks made payable only to the MHPOA and that plaintiff had done so with-

out authorization and without subsequently advising the MHPOA of what he had done. The facts known to defendant Patterson at the time the criminal proceedings were brought against plaintiff were such that a reasonably cautious person could conclude that the question of plaintiff's guilt should go to a jury.[11] Therefore, probable cause on the part of defendant Patterson was established.

Plaintiff also asserts that "Patterson is liable for the acts of his agent Daniel" and cites *Jorgenson v Bartlett Lumber Co,*[12] as authority. The quote is plaintiff's full argument on the point. No supporting explanation is offered. However, *Jorgenson* did not involve a public prosecutor, but rather an employee of the defendant lumber company. When the case involves a public prosecutor, the question of prosecutorial immunity is raised. In *Belt v Ritter,*[13] the Supreme Court said:

"The judiciary has long been granted immunity from suits for malicious prosecution, and this immunity has gradually been extended to cover prosecuting attorneys, on the theory that they act in a quasi-judicial capacity."

We are satisfied that a county prosecutor is immune from tort liability for malicious prosecution. Since plaintiff has not made any argument that the doctrine of *respondeat superior* should defeat immunity, we consider the argument waived.

However, plaintiff argues that the prosecutor is not entitled to immunity when he acts as an investigator. In the instant case, the prosecutor delegated his investigative duties to defendant Daniel and, therefore, says plaintiff, should be

---

[11] *Thomas v Winters, supra.*

[12] 232 Mich 169; 205 NW 138 (1925).

[13] 385 Mich 402, 406; 189 NW2d 221 (1971).

personally liable for Daniel's acts. We do not agree.

We conclude that while it may be argued that such delegation is possible evidence of his instigation of the prosecution, it does not result in a loss of immunity.[14] For these reasons, we affirm the order granting a directed verdict in favor of defendant prosecutor.

Last, plaintiff argues that the trial court erred in granting a directed verdict in favor of defendant Daniel, the prosecutor's investigator. Defendant Daniel concedes that he initiated prosecution against plaintiff and that the prosecution terminated in favor of plaintiff. However, the question of whether defendant Daniel had probable cause to believe plaintiff guilty of larceny by conversion is strenuously disputed by the parties.

In Michigan, probable cause in malicious prosecution is defined as follows:

" 'To constitute probable cause, there must be such reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant an ordinarily cautious man in the belief that the person arrested is guilty of the offense charged.' "[15]

Whether or not probable cause exists is measured as of the time prosecution is commenced.[16]

---

[14] *Bloss v Williams*, 15 Mich App 228; 166 NW2d 520 (1968).

[15] This quote is from *Thomas v Winters, supra*, p 432, where the Supreme Court, in reversing a judgment for plaintiff for malicious prosecution, quoted the syllabi of *Wilson v Bowen*, 64 Mich 133; 31 NW 81 (1887), and went on to hold that an ordinarily cautious man would have had probable cause under the circumstances to sign the complaint. In 54 CJS, Malicious Prosecution, § 26, p 982 the general rule is similarly defined:

"Probable cause for instituting a criminal prosecution is frequently defined as reasonable grounds for suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the accused is guilty of the offense with which he is charged."

[16] *Hall v American Investment Co, supra;* 54 CJS, Malicious Prosecution, § 29, p 988.

Plaintiff has the burden of proof to establish that defendant Daniel *lacked probable cause* to instigate a charge of larceny by conversion against him. *Drobczyk v Great Lakes Steel Corp,*[17] is authority for the proposition that part of a plaintiff's burden of proof in a malicious prosecution case is to show that defendant lacked probable cause for instigating the warrant. In *Drobczyk,* the Court said that the principal question was whether plaintiff, by his proofs, established a want of probable cause for the act of defendant's representative in signing the complaint. The Court said that the fact that the jury failed to find beyond a reasonable doubt that plaintiff was guilty of the offense charged against him is *not* evidence of want of probable cause for institution of prosecution.

As previously indicated, the trial judge held that as a matter of law defendant Daniel had probable cause to prosecute plaintiff for larceny by conversion. *Gooch v Wachowiak*[18] is a case where the Supreme Court held that deciding the want of probable cause issue is one of law for the court, saying:

"There is no dispute as to the facts available to defendant and on which he relied when he signed the complaint. Accordingly, the want of probable cause on his part was a question of law for the court and the court was correct in undertaking to determine it."

However, it should be noted that *Gooch* is a case where the defendant took his facts to the prosecuting attorney who, on the basis of additional police investigation, recommended a warrant. It was only

---

[17] 367 Mich 318; 116 NW2d 736 (1962). Also see, *Hamilton v Smith,* 39 Mich 222 (1878).

[18] 352 Mich 347, 351; 89 NW2d 496 (1958).

after those events that defendant signed the complaint. Under those circumstances, the *Gooch* Court held that there was not any error in a finding by the trial judge that as a matter of law defendant had probable cause.

A balanced statement of the rule is contained in 54 CJS, Malicious Prosecution, § 97, pp 1086-1987, as follows:

"In an abstract and theoretical sense probable cause for the institution of a criminal or civil proceeding is a pure question of law; but it is a rule of practically universal application that whether probable cause exists in a particular case is a mixed question of law and fact. In other words, it is for the jury to determine whether in the particular case the facts relied on to constitute probable cause have been established by the evidence introduced, and for the court to determine from the facts established, admitted, or undisputed whether probable cause exists."

But, where the facts relied on as constituting probable cause are admitted or undisputed and only one inference can be drawn therefrom, the question of probable cause is solely for the determination of the court.

Applied here, these principles suggest the following questions:

1. Did plaintiff make a sufficient showing that defendant Daniel lacked probable cause to instigate prosecution of plaintiff for larceny by conversion? If not, the directed verdict for defendant Daniel should be affirmed.

2. If plaintiff did make a sufficient showing, is the question one of law for the court, or does it include fact issues that must be resolved by a jury? If the former, was the trial judge correct in finding no proof of lack of probable cause? If the

latter, the directed verdict must be reversed, and the case remanded for trial of the issue by a jury.

In this case, plaintiff did show that the larceny by conversion charge against him was dismissed by the district judge at conclusion of the preliminary examination. At a preliminary examination, the prosecution need only show that the crime has been committed and that there is probable cause that defendant committed the crime. Proof beyond a reasonable doubt is not required. In throwing out the larceny by conversion charge against plaintiff, the district judge held that there was not enough evidence of an intent on the part of plaintiff to defraud the MHPOA to justify binding plaintiff over to the circuit court for trial on the merits.

In most jurisdictions, the rule is well settled that "the discharge of [an] accused on a preliminary examination by a magistrate" is prima facie, or some evidence of want of probable cause, or supports an inference of want of probable cause.[19]

We hold that, in the within case, the dismissal on the merits of the larceny by conversion charge against plaintiff by the district judge at the conclusion of the preliminary examination is evidence of a lack of probable cause to prosecute on the part of defendant Daniel.[20] However, although the dismissal was on the merits and not on mere technical grounds, we do not believe that the dismissal is conclusive evidence of a lack of probable cause. Defendant Daniel is entitled to offer countervailing evidence for consideration and weighing. But, the dismissal is sufficient evidence of lack of probable

[19] 54 CJS, Malicious Prosecution, § 34, pp 994-995.

[20] See *Banks v Montgomery Ward & Co,* 212 Md 31, 40; 128 A2d 600 (1957); Prosser, Torts, 2d ed, § 98, p 656; 3 Restatement Torts, 2d, § 663.

cause to meet plaintiff's threshold burden of proof requirement regarding probable cause.

In this case, it is also clear that plaintiff informed defendant Daniel of his claim that his taking possession of the checks, the endorsing of them and the use to which he allegedly put the money was authorized and lawful under his contract with the MHPOA or had been authorized by Officer Carley. We refer to these claims of plaintiff only with reference to the probable cause issue to indicate that questions of fact did exist. We are also aware of the evidence problems in this trial, which often seemed to be of plaintiff's counsel's own making.

Consequently, in this connection, we conclude that fact issues did exist. Since there were fact issues, it was error for the trial court to hold that the question of probable cause was one of law that could be taken from the jury.

Where a complainant, at least one who is a nonlawyer, makes a full and fair disclosure to a prosecutor and the prosecutor determines that a crime has been committed, the complainant may justifiably rely on the prosecutor's determination.[21] One panel of this Court has stated that the above rule "is based upon the idea that defendant has not in fact instituted the prosecution", although the case law seems to speak in terms of probable cause.[22] We are inclined to believe that the rule does have applicability to the question of probable cause.

We are aware that defendant Daniel contends that plaintiff's claim of part equitable ownership of advertising revenues is an immaterial fact, so that the alleged disclosure of defendant Daniel was full

[21] See *Webster v Fowler, supra.*

[22] *Wilson v Yono, supra,* p 444.

and fair for purposes of the rule. However, defendant interprets plaintiff's claim too broadly. Plaintiff did not say that he was entitled to any check payable to any debtor of his. Rather, his claim to the checks was in the context of a contract which stated that the MHPOA would hold the money in trust for plaintiff, that payments must be issued to cover expenses, and that the MHPOA was entitled to $5,000 only if advertising revenues warranted it. Plaintiff thus claimed that he had equitable title to the funds represented by the checks.

Under this theory, plaintiff's intent was a material and crucial fact, since larceny by conversion is a specific intent crime. As stated in *People v Scott*,[23] two of the elements of larceny by conversion are conversion of the property or money to defendant's own use and an intent to defraud or cheat the owner permanently of that property. Defendant simplifies the issue too much by claiming that plaintiff did not intend to return the funds. Keeping the money is not inconsistent with a lack of fraudulent intent if plaintiff in fact believed the money was his.

In this case, defendant Daniel did not make a sufficient showing at trial as to exactly what he told the assistant prosecutor who authorized the warrant to entitle defendant Daniel to the protection of this rule. But, defendant Daniel argues that, even if we were to assume that he did not make full disclosure to the chief of warrants, his failure to make full disclosure would not prove lack of probable cause.[24] Daniel's failure to establish that he made full disclosure only means that he may not rely on the chief of warrants' determi-

[23] 72 Mich App 16, 19; 248 NW2d 693 (1976).

[24] See *LaLone v Rashid*, 34 Mich App 193, 198; 191 NW2d 98 (1971), *lv den* 386 Mich 756 (1971).

nation as a defense to a claim that he lacked probable cause. Other facts may still support a finding of probable cause, which is defined in *Clanan v Nushzno*[25] as follows:

" 'Probable cause is such reasonable ground of suspicion, supported by known circumstances, or by information of sufficient character, to justify an ordinarily cautious person in believing that the accused is guilty of the alleged crime.' *Gilecki v Dolemba* (syllabus), 189 Mich 107 [155 NW 437 (1915)]."

In this case, the facts underlying plaintiff's claim of ownership to the checks were in dispute. The MHPOA maintained that plaintiff had been adequately paid for expenses and was not entitled to any more money. The MHPOA records were not in a condition to conclusively resolve the issue. While plaintiff was not officially authorized to endorse the checks, he told defendant Daniel that Officer Carley said he "could have a hundred". Because of the disputed fact as to who had proper claim to the funds, we hold that it became a jury question whether defendant Daniel had probable cause to believe that plaintiff was guilty of larceny by conversion. We have not discussed the question of malice which is, of course, an element of malicious prosecution because the trial court did not rely on it or discuss it. On retrial, malice will necessarily be left for the jury, since, if the jury finds a lack of probable cause, it may thereupon infer malice.

In conclusion, we hold that the issue of whether defendant Daniel had probable cause to seek a warrant charging plaintiff with larceny by conversion was, in this case, one of fact or perhaps, in

[25] 261 Mich 423, 427; 246 NW 168 (1933). See, also, cases cited in fn 15, *supra*.

another sense, a mixed question of law and fact. It was not, as the trial judge found, a question of law for the court. It was for the jury to decide whether defendant Daniel had probable cause to instigate prosecution of plaintiff for larceny by conversion and, for that reason, we reverse the trial court's order granting a directed verdict for defendant Daniel and remand for a new trial on the merits.

Affirmed in part; reversed in part.

HOOD, P.J., concurred.

W. J. CAPRATHE, J. (concurring in part and dissenting in part). I concur in the majority opinion with respect to all defendants except Danny R. Daniel. I would affirm the trial court's order granting a directed verdict in favor of defendant Daniel as well.

Where the material facts are not in dispute, the determination of probable cause in a malicious prosecution case is a question of law for the trial judge. In *Clanan v Nushzno,* 261 Mich 423, 427; 246 NW 168 (1933), cited by the majority, the Court stated:

" 'The general rule of the common law, sustained by the overwhelming weight of authority, both in England and America, is that what facts, and whether particular facts, constitute probable cause is a question of law, which the judge must decide upon the facts found to exist in the particular case, and which it is error for him to submit to the decision of the jury.' 18 R.C.L. § 39, p 58.

" 'Probable cause is such reasonable ground of suspicion, supported by known circumstances, or by information of sufficient character, to justify an ordinarily cautious person in believing that the accused is guilty of the alleged crime.' *Gilecki v Dolemba (syllabus),* 189 Mich 107 [155 NW 437 (1915)].

" 'Facts which would justify a reasonably prudent man in asking that a jury pass upon accused's guilt would justify defendant in making the complaint.' *Weiden v Weiden (syllabus),* 246 Mich 347 [224 NW 345 (1929)]."

Since the material facts in the present case were undisputed, it was for the trial court to determine whether plaintiff had sustained his burden of proving that defendant Daniel lacked probable cause to instigate the criminal charges of larceny by conversion. See, also, *Drobczyk v Great Lakes Steel Corp,* 367 Mich 318; 116 NW2d 736 (1962).

The majority relies on the fact that the district court judge dismissed the larceny by conversion charges on the merits at the preliminary examination. The majority looks to authority outside Michigan to support the proposition that a district court's dismissal on the merits at the preliminary examination is either evidence of or a prima facie case of lack of probable cause, citing *Banks v Montgomery Ward & Co, Inc,* 212 Md 31; 128 A2d 600 (1957). The *Banks* Court stated:

"The general rule seems to be that prima facie evidence of want of probable cause is shown either by discharge by a magistrate upon preliminary hearing on the merits or the termination of the proceedings at the instance of the private prosecutor who initiated them, or by reason of his failure to press the charge. Restatement, Torts, §§ 663, 665. * * * *Some courts hold that neither an acquittal nor a discharge in preliminary hearing is relevant on the question of probable cause since the decisive time for determining its presence or absence is the time the defendant acted and that this test is not to be affected by what later occurs.* Mr. Justice Brennan so held for the Appellate Division of the Superior Court of New Jersey in *Shoemaker v Shoemaker,* 11 NJ Super 471; 78 A2d 605 (1951)." (Emphasis supplied.)

In my opinion, the *Shoemaker* holding represents the more logical view. There are many reasons why a charge may be dismissed on the merits at the preliminary examination stage which did not exist at the time the warrant was signed. In

the present case, for example, Dennis Carley, secretary-treasurer of the Madison Heights Police Officers' Association, was available and apparently credible at the time defendant Daniel obtained the information which led to issuance of the warrant. On the other hand, at the time of the preliminary examination (held long after Daniel's investigation), Carley was no longer available to testify. His credibility had been destroyed because his records were in terrible disarray and he had admitted stealing money from the trust account. Circumstances had changed dramatically by the time of the dismissal. In my opinion, dismissal of the charges at the preliminary examination should be used only to satisfy the requirement that the prosecution was terminated in favor of the plaintiff, and the dismissal of those charges is not relevant to the element of lack of probable cause to commence the prosecution.

The Michigan Supreme Court has apparently already taken the view that dismissal on the merits at the preliminary examination is not relevant to the question of probable cause in a malicious prosecution action. In *Gooch v Wachowiak,* 352 Mich 347, 350; 89 NW2d 496 (1958), the trial court directed a verdict of no cause of action upon a finding that the plaintiff had failed to make out a case as to the element of probable cause. The Court stated:

"Plaintiff says that the court erred in directing a verdict for defendant and that a case was made for the jury by a showing that the plaintiff had been discharged at the preliminary examination, that he had enjoyed a good character and reputation previously, which defendant knew and failed to tell the prosecuting authorities, and that the time element was such, after plaintiff's leaving work at the Wall Wire Company at 3:30 p.m.,

standing in line to punch out at the time clock and to receive his pay check, walking 2 blocks to a parking lot and driving from 1 to 2 miles to the Kroger store, all before 3:50 p.m., that defendant could not have had probable cause to believe plaintiff guilty of the offense as claimed by Courtney Spencer."

The Court thoroughly discussed the concept of probable cause and the conditions under which its existence or nonexistence is a legal question for the trial court. Nowhere did the Court authorize use of the dismissal at the preliminary examination as some evidence of lack of probable cause or as providing a prima facie case of lack of probable cause. Rather, the opinion directs the trial courts, even when the underlying case was dismissed at the preliminary examination, to examine the facts and determine whether there is a factual dispute and, if not, to decide the question as a matter of law.

In the present case, the facts upon which the trial court made its legal decision are virtually undisputed, such that determination of the issue of probable cause was properly for the trial court. I believe the facts and reasonable inferences therefrom, viewed in a light most favorable to plaintiff, support the granting of a directed verdict in favor of defendant Daniel. The plaintiff was required under the contract to deposit all checks in the association's trust account. He was to be thereafter paid monies for expenses in publishing the magazine. Plaintiff claimed that there were monies due to him for those expenses and, further, that one of the members of the association had told him he could take $100. Plaintiff endorsed the name of the association on some of the advertisers' checks, cashed them and used the money for payment of expenses, rather than placing the checks in the

association's account. Thus, the legal question is: Was there probable cause under these undisputed facts to institute larceny by conversion charges? In my opinion, there was. In *Gooch v Wachowiak, supra,* pp 351-352, the Supreme Court stated, quoting *Thomas v Winters,* 258 Mich 429, 432; 242 NW 780 (1932):

" 'As to what is probable cause, we quote syllabi of *Wilson v Bowen,* 64 Mich 133 [31 NW 81 (1887)]

" ' "To constitute probable cause, there must be such reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant an ordinarily cautious man in the belief that the person arrested is guilty of the offense charged.

" ' "A person may have 'probable cause' for making a criminal complaint from information received from others, which he honestly believes to be true, and of such a character, and obtained from such sources, that business men generally, of ordinary care, prudence, and discretion, would act upon it under such circumstances, believing it to be reliable." ' "

In the instant case, the total amount of the checks which plaintiff illegally endorsed and cashed was well above $100. Certainly the fact that he was told he could take "a hundred" did not give him the right to cash three checks totaling well above $100. More importantly, no interpretation of these facts would permit plaintiff to use the self-help method of collecting the civil debt which he believed was owed to him by the association. There were proper legal channels open to plaintiff to collect the alleged debt. The mere fact that plaintiff claimed the association owed a debt to him does not affect the probable cause issue, since it is clear that plaintiff had no legal right to endorse the checks with the association's name or to cash them and convert the funds to his own use.

In order to create a factual dispute sufficient to send the probable cause issue to the jury, there would have to be evidence that plaintiff legitimately believed he had a legal right to cash the particular checks involved. The case is distinguishable from *Clanan v Nushzno, supra,* because there plaintiffs claimed the right to retain the particular payments involved. No such evidence or allegation is present in the instant case.

An additional reason for upholding the trial court's directed verdict as to defendant Daniel is that, as a non-lawyer, Daniel made a substantially full disclosure of the results of the investigation to the prosecutor, who then determined that a criminal prosecution was warranted. I agree with the majority that this is relevant to the element of probable cause. See *Wilson v Yono,* 65 Mich App 441, 444; 237 NW2d 494 (1975). I disagree with the majority, however, and agree with defendant Daniel that his failure to communicate to the prosecutor the plaintiff's claimed entitlement to the advertising revenues did not involve a material fact. Daniel investigated the circumstances at the request of the prosecutor and presented the following evidence: at least three business entities had issued checks payable only to the association; plaintiff had obtained some of the checks without the approval of the association and had endorsed the association's name on the checks and either cashed or deposited them in his own account; and plaintiff admitted this but alleged that the money was actually owed to him by the association. Even assuming Daniel did not make a full disclosure concerning plaintiff's claim of a debt owed to him by the association, it does not affect the probable cause element. As discussed earlier, even if money from the association's trust account was to be

forwarded to plaintiff for expenses in publishing the magazine, plaintiff had no legal right to endorse the association's name on the checks and convert the funds to his own use. Plaintiff's claim of equitable title to the funds represented by the checks is not a material fact since plaintiff acted illegally. I would find that defendant Daniel made a full and fair disclosure to the prosecutor.

In conclusion, I would hold that whether defendant Daniel had probable cause to seek a warrant charging plaintiff with larceny by conversion was a matter of law. The trial judge, viewing the facts in a light most favorable to plaintiff, correctly found that defendant Daniel acted with probable cause based upon his investigation. In addition, by presenting the matter to the prosecutor, he was removed from any responsibility with respect to the prosecution since he completely and fairly communicated all materal facts. Therefore, I would affirm the trial court as to all defendants. I decline to discuss the element of malice since it was not addressed by the trial court and the question is not presently before this Court.